**Garrett Bernard Tupper Jr.**
**537 Liberty Ave.**
**Williston Park, NY 11596**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **Garrett Bernard Tupper Jr.,**<br><br>**Bankruptcy Petitioner,**<br><br>**vs.**<br><br>**U.S. Trustee,** | § | **CASE NO.: 8-24-73979-las**<br><br>**MOTION TO REOPEN THE CASE UNDER 26 U.S. Code § 362 AND REINSTATE THE CASE UNDER 11 U.S.C. § 350 (a)**<br><br>**NOTICE OF DEATH 22 CFR § 72.4**<br><br>**COURT VIOLATED AMERICANS WITH DISABILITIES ACT Of 1990 42 U.S.C. §§ 12101 et seq.**<br><br>**HEARING REQUESTED** |

## i. MOTION TO REOPEN THE CASE UNDER 26 U.S. Code § 362 AND REINSTATE THE CASE UNDER 11 U.S.C. § 350 (a)

**Petitioner** Garrett Bernard Tupper Jr. motions to reopen under 26 U.S. Code § 362 including (c) and to reinstate case 11 U.S.C. § 350 (a). All documents that are required to be filed by the debtor(s) under 11 U.S.C. §521(a)(1). In this case, the Petitioner has several medical

ailments that impede his ability to write and respond, See 42 U.S.C. § 12102 and Davis v. State, 70 Ga. 722, contracted COPD, Asthma, and Gout, making it very difficult to be aware and to render fast responses in this case. In addition; on November 16th, 2024 the Petitioner's brother passed 22 CFR § 72.4, attending the funeral on November 23rd, 2024, which adds additional delay to responding in this case.

The Petitioner's hearing on November 22nd, 2024 was informed he missed his 341 creditors meeting on November 12th, 2024, the US Trustee Michael J. Macco informed the Petitioner verbally that the Meet of Creditors was adjourned (postponed) and would not be held till further notice. Misappropriating meetings and hearings to a disabled petitioner violates the Americans with Disabilities Act of 1990 42 U.S.C. §§ 12101 et seq. In addition; Violating the Petitioner's Constitutional Rights under Article I, Section 8, Clause 4 of the Constitution gives Congress the power to create uniform bankruptcy laws across the country, additionally violates these rights by ordering the Petitioner **NOT** able to file a new Bankruptcy Petition in 180 days, which anyone can file for bankruptcy without worrying about state or local regulations, including Court violated the Petitioner's protection under The Bankruptcy Abuse Prevention and Consumer Protection Act Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) of 2005, stripped the Petitioner of his protection under 26 U.S. Code § 362, failing to have a hearing to discuss the Docket 33 Objection filed on November 19th, 2024.

Per the hearing on November 21st, 2024 stating that the Petitioner only filed for Bankruptcy "to fight Foreclosure", the Petitioner has this right, as there are several discrepancies in the Purported Mortgage. Attorney Michael Thomas Rozea of Law Firm Friedman Vartolo

LLP Purported he represents SN Servicing Corporation as servicer for U.S. Bank Trust National Association as Trustee of Dwelling Series IV Trust and showed NO Beneficiary Lending Bank that would have authority to collect on a Mortgage, a Servicer such as SN Servicing Corporation does not have any stake in Mortgages they are solely hired to send the Petitioner payment coupons. A Trustee of Mortgage Dwelling Series IV Trust is not licensed as any Banking Licensed having no authority to collect monies, acting as a Licensed national bank under the Government Regulators Office of Comp Controllers is a violation under False Claims 18 U.S.C. § 152(4) Subsection (4) of Section 152 exhibit "B" Tila and Respa violations under the Office of the Comp Controller Government Regulations violated by SN Servicing Corporation and MTGLQ.

To further the Creditor's False Claims in this case, another creditor for the same purported Mortgage appears Servicer MTGLQ Investors, L.P.,., owned and controlled by Goldman Sachs, which does not own or service any mortgages itself. MTGLQ Investors, L.P. Goldman Sachs handles MBS securities such as Fannie Mae, Freddie Mac, and U.S. Bank National Association/BANCORP, and these three entities do not share loan Securities that cross Mortgage to Mortgage, a Mortgage can only have one or the other. For example; One Mortgage a homeowner has either Fannie Mae, Freddie Mac, or U.S. Bank National Association/BANCORP handles the Securities for the Mortgage **NOT** all of the above. The US Trustee Michael J. Macco should have observed these blatant Falsified claims in this case but intentionally ignored this key point, a violation under 11 U.S. Code § 102(2) "claim against the debtor Petitioner" includes a claim against property of the debtor with defective false claims acting in bad faith under 18 U.S.C. § 152(4).

Below is an exhibit from the Federal Home Finance Agency Office of Inspector General's 24-page overview of the foreclosure process, all of which the US Trustee is to examine and validate the debt under 11 U.S. Code § 102(2) "claim against the Debtor the Petitioner" The Mortgage SN Servicing Corporation purports contains solely a Servicer, Trust, and Law Firm never prevailing the **Lending Beneficiary Bank Licensed Lender**. This is why the exhibit "A" Proof of Claim 410 form was ignored by SN Servicing Corporation, which has to be completed before a US Trustee can make the payment to the proper party.

**AN OVERVIEW OF THE HOME FORECLOSURE PROCESS**

**Lien:**
The lender's right to have a specific piece of the debtor's property sold if the debt is not repaid. With respect to residential mortgages, the noteholder retains a lien on the house (as evidenced by the mortgage or deed of trust) until the loan is repaid.

The beneficiary is the Lender, Licensed National Bank, and regulated by the Office of Comp Controller. Three parties are involved in a deed of trust: the trustor (or the borrower), the trustee (the third party who holds legal title to the property), and the Bank beneficiary (the lender), which is the only party of authority to send an Acceleration Notice or Foreclose.

The form of the security instrument affects the foreclosure process. Legally speaking, a mortgage is the granting of a lien. The homeowner, as mortgagor, retains title to the property and grants a contingent interest to the lender as mortgagee. Alternatively, a DOT is more akin to a sale and repurchase: the homeowner, as the trustor, gives title to the property to the DOT trustee, who holds it on behalf of the lender as beneficiary. The DOT trustee is typically a title company or a local attorney. The DOT trustee is charged with releasing the deed to the trustor if the loan is paid off or with foreclosing if the trustor defaults. In the standard DOT arrangement, if the homeowner defaults, the beneficiary noteholder will appoint a substitute trustee, often an affiliate, to handle foreclosure. The precise duties of DOT trustees may be a potential issue in foreclosures![i]

**Figure 10. Deed of Trust**




[i] DOT trustees should not be confused with securitization trustees. Many securitizations involve a trust that holds legal title to the mortgages and notes. These trusts have a trustee – a major financial institution – that acts as an agent for the trust, carrying out functions such as remitting payments to investors in the securities issued by the trust and reporting to investors on the performance of the trust's mortgages. The actual management of the mortgages, though, is carried out by another entity, known as the servicer

## ii. JURISDICTION

This Court has jurisdiction over this matter under 28 U.S.C. § 157,28 U.S.C. §1334, and the Amended Standing Order of Reference signed by Chief Judge Loretta A. Preska dated January 31st,2012 This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). This decision constitutes the court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52.

## iii. ADDITIONAL SUPPORT OF THIS MOTION

On October 31st. 2024 the Petitioner perfected his documents, Petition and Plan, then E-filed them into this case.

The Petitioner's main purpose for filing this Bankruptcy was to be protected against the Mortgage Servicer SN Servicing Corporation. The Petitioner expected the U.S. Trustee to facilitate the validity of the creditor SN Servicing Corporation's Mortgage Claims are correct under 11 U.S.C. § 704 Duties of trustee (a) The trustee shall (5) if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper. The Petitioner asked SN Servicing Corporation to provide who is the Beneficiary Lending Bank that supportably funded the loan, only the Beneficiary Lender who funded the monies can order a Servicer to collect or render a Foreclosure, a Servicer is not to have any steak in the loan and solely collect for their profits, and why the Petitioner E-filed the Proof of Claim 410 form. SN Servicing Corporation has had a history of defective false claims acting in bad faith under 18 U.S.C. § 152(4) and violations under the real estate federal Fair Housing Act, under 42 U.S.C. §

3601-3631. for the said property requested debtor's protection under 11 U.S.C. § 544(1)(a) Federal Real Estate laws under 28 U.S.C. § 2409a. The False Claims Act (FCA) is the government's primary enforcement tool for prosecuting fraudulent civil claims. The Petitioner has requested several documents of the history of the loan, such as payment history, what were the amount of the payments after the close of escrow, SN Servicing Corporation has NO history whatsoever. The only parties the Petitioner can see in this purported Mortgage Loan are the Law Firm that is connected to the Reconveyance Company and SN Servicing Corporation the Servicer with no Beneficiary Lender who supposedly loaned and funded the loan present. The Petitioner wants to resolve the debt pay the proper party and amend his plan accordingly and cannot pay SN Servicing Corporation until the U.S. Trustee investigates and validates the proper Party to pay in accordance to 11 U.S.C. § 503.

"Additional support for the purported Mortgage"

The Petitioner issued a Notice to SN Servicing Corporation and Rescinded the loan for Breach of Contract, which SN Servicing Corporation ignored. The purported Deed of Trust and Note was fabricated on a Fannie Mae contract. The Petitioner used the Fannie Mae look-up tool entering his Social Security Number and no said loan was found. With this said, the Petitioner's Prayer is the U.S. Trustee will continue to investigate and find the proper parties to pay and protect the Petitioner's said property.

////////////////////////////////////////////////////

**DATED this**

Dated: January 2, 2025

/s/Garrett B. Tupper Jr.

**Garrett Bernard Tupper Jr.**

## iv. Exhibit Cover Page

**Exhibit "A"** "Proof of Claim"

**Pages 6**

**Exhibit "B"** "Tila and Respa violations under the Office of the Comptroller of Government Regulations violated by SN Servicing Corporation and MTGLQ"

**Pages 8**

**Exhibit "C"** "OCC and Government Home Proper Foreclosure Process"

**Pages 25**

# Exhibit "A"

Exhibit "A"

**Fill in this information to identify the case:**

Debtor 1 **Garrett Bernard Tupper, Jr.**

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: **EASTERN DISTRICT OF NEW YORK**

Case number **8-24-73979-las**

Official Form 410

# Proof of Claim

**12/24**

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1: Identify the Claim

**1. Who is the current creditor?**

**S/N Servicing Corp.**
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| **S/N Servicing Corp.** (Name) | Name |
| **323 5th Street** (Number Street) | Number Street |
| **Eureka** (City) **CA** (State) **95501** (ZIP Code) | City State ZIP Code |
| Contact phone | Contact phone |
| Contact email | Contact email |

Uniform claim identifier (if you use one):

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) ______ Filed on ______ MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

SN Servicing Corporation is purporting an incorrect Mortgage Account Number and has continued to show Proof of Claim, in addition; to failed to show which Banking Beneficiary Lender is the Noteholder

## Part 2: Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

☐ No
☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor 7 4 0 5

**7. How much is the claim?**

$0.00

**Does this amount include interest or other charges?**

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Goods sold

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: ____

**Basis for perfection:** ____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** ____

**Amount of the claim that is secured:** ____

**Amount of the claim that is unsecured:** ____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** ____

**Annual Interest Rate** (when case was filed) ____

☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition:** ____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: ____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

**Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). ______

☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). ______

☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). ______

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). ______

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). ______

☐ Other. Specify subsection of 11 U.S.C. § 507(a)( ____ ) that applies. ______

* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☑ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date ______
MM / DD / YYYY

______
Signature

**Print the name of the person who is completing and signing this claim:**

Name ______
First name Middle name Last name

Title ______

Company ______
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address ______
Number Street

______
City State ZIP Code

Contact phone ______ Email ______

SN Servicing Corporation is purporting an incorrect Mortgage Account Number and has continued to show Proof of Claim, in addition; to failed to show which Banking Beneficiary Lender is the Noteholder

# Mortgage Proof of Claim Attachment

**If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof**

| **Part 1: Mortgage and Case Information** | | **Part 2: Total Debt Calculation** | | **Part 3: Arrearage as of Date of the Petition** | |
|---|---|---|---|---|---|
| Case number: | | Principal balance: | | Principal due: | |
| Debtor 1: | | Interest due: | | Interest due: | |
| Debtor 2: | | Fees, costs due: | | Prepetition fees due: | |
| Last 4 digits to identify: | __ __ __ __ | Escrow deficiency for funds advanced: | | Escrow deficiency for funds advanced: | |
| Creditor: | | Less total funds on hand: | – | Projected escrow shortage: | |
| Servicer: | | Total debt: | | Less funds on hand: | – |
| Fixed accrual/daily simple interest/other: | | | | Total prepetition arrearage: | |

**Part 5 : Loan Payment History from First Date of Default**

| | | Account Activity | | | | | How Funds Were Applied/Amount Incurred | | | | | Balance Aft | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **A.** | **B.** | **C.** | **D.** | **E.** | **F.** | **G.** | **H.** | **I.** | **J.** | **K.** | **L.** | **M.** | **N** |
| Date | Contractual payment amount | Funds received | Amount incurred | Description | Contractual due date | Prin, int & esc past due balance | Amount to principal | Amount to interest | Amount to escrow | Amount to fees or charges | Unapplied funds | Principal balance | A in ba |
| | | | | | | | | | | | | | |

## Mortgage Proof of Claim Attachment: Additional Page

Case number: ____________________

Debtor 1: ____________________

**Part 5 : Loan Payment History from First Date of Default**

| Account Activity | | | | | | | How Funds Were Applied/Amount Incurred | | | | | Balance Aft | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **A.** Date | **B.** Contractual payment amount | **C.** Funds received | **D.** Amount incurred | **E.** Description | **F.** Contractual due date | **G.** Prin, int & esc past due balance | **H.** Amount to principal | **I.** Amount to interest | **J.** Amount to escrow | **K.** Amount to fees or charges | **L.** Unapplied funds | **M.** Principal balance | **N** A in ba |
| | | | | | | | | | | | | | |

# Exhibit “B”

Exhibit “B"

Laws and Regulations

Key laws and regulations that pertain to FDIC-supervised institutions; note that other laws and regulations also may apply.

Truth in Lending Act

Part 1026 — Truth in Lending (Regulation Z) (ecfr.gov) provides access to the Consumer Financial Protection Bureau's (CFPB) Regulation Z — Truth in Lending

Section 303.248 — Truth in Lending Act (ecfr.gov) provides regulatory information regarding requests for relief from reimbursement pursuant to

the TILA

Ability-to-Repay/Qualified Mortgage Rule

Ability to Repay/Qualified Mortgage Rule provides access to the details on the sections of Regulation Z — Truth in Lending that apply to the ATR/QM Rule. Main ATR/QM Rule provisions and official interpretations can be found in:

a) § 1026.43(a), Scope
b) § 1026.43(b), Definitions
c) § 1026.43(c), Ability to repay
d) § 1026.43(d), Refinancing of non-standard mortgages
e) § 1026.43(e), Qualified Mortgage
f) § 1026.43(f), Balloon-payment qualified mortgages made by certain creditors
g) § 1026.43(g), Prepayment penalties

Real Estate Settlement Procedures Act

12 CFR Part 1024 — Real Estate Settlement Procedures Act (Regulation X) (ecfr.gov) provides access to the CFPB's Regulation X — Real Estate Settlement Procedures

TILA-RESPA Integrated Disclosure Rule

TILA-RESPA Integrated Disclosures provides access to the details on the sections of Regulation Z — Truth in Lending that apply to the TRID Rule. Main TRID Rule provisions and official interpretations can be found in:

a) § 1026.19(e), (f), and (g), Procedural and timing requirements
b) § 1026.37, Content of the loan estimate
c) § 1026.38, Content of the closing disclosure

Supplement I to Part 1026 (including official interpretations for the above provisions)

Mortgage Servicing

Mortgage Servicing Rules provide access to the details on the sections of Regulation X — Real Estate Settlement Procedures and Regulation Z — Truth in Lending that apply to mortgage servicing. Main mortgage servicing provisions and official interpretations can be found in:

a) § 1024.17, Escrow accounts and § 1024.37, Forced placed insurance
b) § 1024.35, Error resolution procedures and § 1024.36, Requests for information
c) § 1024.38, General servicing policies, procedures, and requirements
d) § 1024.39, Early intervention and § 1024.41, Loss mitigation procedures
e) § 1026.20, Disclosure requirements regarding post-consummation events
f) § 1026.36, Payment processing and § 1026.41, Periodic statements
g) § 1026.40, Continuity of Contact

Supplement I to Part 1024 and 1026 (including official interpretations for the above provisions)

Home Ownership and Equity Protection Act Rule

High-Cost Mortgage and Homeownership Counseling Amendments to the Truth in Lending Act (Regulation Z) and Homeownership Counseling Amendments to the Real Estate Settlement Procedures Act (Regulation X) (consumerfinance.gov) provides the final rule issued by the CFPB

Homeowners Protection Act

12 USC §4901-4910 (uscode.house.gov) outlines requirements for disclosures and the termination of private mortgage insurance in connection with residential mortgages.

Secure and Fair Enforcement for Mortgage Licensing Act
Part 1007 — S.A.F.E. Mortgage Licensing Act (Regulation H) (ecfr.gov) provides access to regulatory information regarding the secure and fair enforcement for the Mortgage Licensing Act
Supervisory Resources
Frequently asked questions, advisories, statements of policy, and other information issued by the FDIC alone, or on an interagency basis, provided to address consumer protection issues.

Truth in Lending Act
Section V. Lending — TILA (PDF) of the FDIC's Consumer Compliance Examination Manual provides an introduction to the TILA and outlines regulatory requirements as well as related examination procedures
Section V. Lending — TIL Restitution (PDF) of the FDIC's Consumer Compliance Examination Manual provides information that relates to the identification of TILA violations subject to restitution, restitution calculations, and the determination of appropriate correction action
Administrative Enforcement of the Truth in Lending Act — Restitution (PDF) (govinfo.gov) is a joint statement of policy that summarizes the restitution provisions of the TILA and explains corrective actions the financial regulatory agencies will generally intend to take in those situations in which the TILA gives the agencies the authority to take equitable remedial action

Ability-to-Repay/Qualified Mortgage Rule
Interagency Statement on Supervisory Approach for Qualified and Non-Qualified Mortgage Loans (PDF) clarifies safety-and-soundness and Community Reinvestment Act considerations for institutions engaged in residential mortgage lending in light of the CFPB's Ability-to-Repay and Qualified Mortgage Standards Rule

Real Estate Settlement Procedures Act
Section V. Lending — RESPA (PDF) of the FDIC's Consumer Compliance Examination Manual provides an introduction to the RESPA and outlines regulatory requirements as well as related examination procedures

Servicing
Section V. Lending — Homeownership Counseling Act (PDF) of FDIC's Consumer Compliance Examination Manual includes an introduction to Section 106(c)(5) of the Housing and Urban Development Act of 1968 and outlines regulatory requirements as well as related examination procedures
Section V. Lending — HOPA (PDF) of the FDIC's Consumer Compliance Examination Manual provides an introduction to the Homeowners Protection Act of 1998 and outlines regulatory requirements as well as related examination procedures

Secure and Fair Enforcement for Mortgage Licensing Act
Section V. Compliance Lending — SAFE Act (PDF) of the FDIC's Consumer Compliance Examination Manual provides background, requirements, and examination procedures regarding the SAFE Act and the SAFE Act regulation concerning federal registration
Interagency Guidance Regarding Unfair or Deceptive Credit Practices (PDF) provides clarification regarding certain consumer credit practices for banks, savings associations, and federal credit unions
Interagency Statement on Meeting the Needs of Creditworthy Borrowers provides information on several programs designed to promote financial stability and to mitigate procyclical effects of market conditions
FDIC's Supervisory Policy on Predatory Lending describes certain characteristics of predatory lending and reaffirms that such activities undermine individual, family, and community economic well-being
Interagency Expanded Examination Guidance for Subprime Lending Programs is intended to strengthen the examination and supervision of institutions with subprime lending programs that equal or exceed 25 percent of an institution's Tier 1 regulatory capital.

Interagency Guidance on Subprime Lending — Consumer Protection provides guidance for institutions that originate or purchase subprime loans and the consumer protection risks associated with subprime lending
FIL-44-97 - Risks Associated with Subprime Lending outlines some general controls to effectively manage the risks associated with subprime lending

Subprime Mortgage Products — Interagency Illustrations of Consumer Information for Hybrid Adjustable Rate Mortgage Products (PDF) assists in the implementation of the Consumer Protection Principles portion of the Interagency Statement on Subprime Mortgage Lending

Other Resources
Supplemental information related to consumer protection issues.

Truth in Lending Act
Truth in Lending Threshold Adjustments provides information on the annual TILA threshold adjustments for exempt consumer credit transactions
CFPB Resources on the TILA Higher-Priced Mortgage Loans Appraisal Rule provides resources to help industry participants understand, implement, and comply with the TILA higher-priced mortgage loan appraisal rule

CFPB Resources on the TILA Higher Priced Mortgage Loan Escrow Rule provides resources to help industry participants understand, implement, and comply with the TILA higher-priced mortgage loan escrow rule
CFPB Resources on the Loan Originator Rule includes resources to help industry participants understand, implement, and comply with the loan originator rule

Ability-to-Repay/Qualified Mortgage Rule
CFPB Resources on the Ability to Repay/Qualified Mortgage Rule provides resources to help industry participants understand, implement, and comply with the ATR/QM Rule

What is a Qualified Mortgage? provides access to the general requirements for a qualified mortgage

Qualified Mortgage Definition under the Truth in Lending Act (Regulation Z) provides the advanced notice of proposed rulemaking whereby the CFPB

requested information about possible revisions to Regulation Z's general qualified mortgage definition

Real Estate Settlement Procedures Act
RESPA Compliance and Marketing Services Agreements (PDF) includes the CFPB's compliance bulletin which reminds participants in the mortgage industry of the prohibition on kickbacks and referral fees under the RESPA and describes the risks posed by entering into marketing services agreements

TILA-RESPA Integrated Disclosure Rule
CFPB TILA-RESPA Integrated Disclosures provides resources to help industry participants understand, implement, and comply with the TRID

Rule
TILA-RESPA Integrated Disclosure FAQs pertain to compliance with the

TRID Rule
Rural and Underserved Counties List provides guidance to the entities that do business in rural or underserved counties and are exempt from certain regulatory requirements of the TILA

Servicing
CFPB Resources on Mortgage Servicing Rules provides resources to help the industry understand, implement, and comply with the mortgage

servicing rules
Small Servicers and Key Provisions of the 2016 Mortgage Servicing Rule (PDF) provides highlights and summarizes the changes and clarifications that directly affect small servicers
Home Ownership and Equity Protection Act Rule
Homeownership Counseling Organizations Lists and High-Cost Mortgage Counseling Interpretive Rule reissues a prior interpretive rule and implementation guidance

HOEPA Rule Small Entity Compliance Guide (PDF) provides the CFPB's summary of the HOEPA Rule
HUD Approved Housing Counseling Agencies provides access to listings of housing counseling agencies by state
Secure and Fair Enforcement for Mortgage Licensing Act
CFPB Resources for the Secure and Fair Enforcement for Mortgage Licensing Act provides resources to help industry participants understand, implement, and comply with the SAFE Act
Secure and Fair Enforcement for Mortgage Licensing Act FAQs (PDF) pertain to compliance with the SAFE Act
Videos/Webcasts/Teleconferences
Informational videos and recordings of prior webcasts and teleconferences.

Truth in Lending Act
FDIC Technical Assistance Video series on Loan Originator Compensation Rule introduces the loan originator compensation rule and brings a focus on those provisions of the rule of particular interest to community banks
Ability-to-Repay/Qualified Mortgage Rule
FDIC Technical Assistance Video series on Ability to Repay & Qualified Mortgages discusses the ATR/QM Rule with a focus on aspects of the rule of particular interest to community bankers

Servicing
FDIC Technical Assistance Video series on Mortgage Servicing Rules — Small Servicers provides information on the Mortgage Servicing Rules with particular emphasis on those entities that qualify for the small servicer

Exemption
The FDIC's Technical Assistance Video Program includes educational videos designed to provide bank directors, officers, and employees with useful information about areas of supervisory focus and regulatory changes.

# Exhibit "C"

Exhibit "C"




# AN OVERVIEW OF THE HOME FORECLOSURE PROCESS

# An Overview of the Home Foreclosure Process

**Foreclosure:**
The legal process used by a lender to secure possession of a mortgaged property.

Among the most prominent features of the current housing crisis has been an unprecedented jump in the incidence of mortgage delinquencies and **foreclosures**. Public policy and financial market observers have attributed delinquency and foreclosure increases to a wide range of causes and have offered varying policy prescriptions for what remains a continuing problem. Allegations of improper or deficient practices on the part of mortgage originators and servicers have also been a major source of controversy over the past few years. By identifying and describing the procedures and requirements that characterize an appropriately executed foreclosure process, FHFA-OIG seeks to provide useful context and understanding for policymakers and members of the public.

Most home purchases in the United States are financed through loans provided by banks or other lenders. Lenders, as part of the legal process that provides cash financing to borrowers, typically require a secured interest or mortgage on the property financed. Borrowers agree to accept the secured interest on their properties and to repay the loans provided over time. The foreclosure process typically commences only after a borrower has stopped repaying the loan (meaning that the loan has gone into default); the lender therefore uses the foreclosure process to recover the proceeds of the loan through the sale of the property. Foreclosure involves specific rights and obligations with respect to both the homeowner/borrower and the lender (or its representatives) through each step of the process.

Before turning to default and the foreclosure process, however, this overview reviews the legal process supporting mortgage loans. It next turns to default, the gateway to foreclosure, before discussing the foreclosure process and loss mitigation options. This discussion will also identify sources of information regarding federal programs designed to assist homeowners who may be involved in, or at risk of, foreclosure proceedings.

## FUNDAMENTALS OF THE MORTGAGE

A mortgage is a loan secured by real estate collateral, specifically the borrower's house or apartment.[a] While the term "mortgage" is used colloquially to refer to both the loan and the security, there are actually two separate legal documents: a note and a security instrument.

[a] Although real estate investors may also finance their purchases of commercial properties, such as office buildings and rental apartment complexes, through mortgage debt, this discussion will center specifically on residential mortgages.

**Securitization:**
A process whereby a financial institution assembles pools of income-producing assets (such as loans) and then sells an interest in the cash flows as securities to investors. See page 20, Figure 1.

## The Note

The note represents the promise or agreement of the homeowner (mortgagor) to repay the loan to the lender or noteholder and specifies the terms of repayment, such as the interest rate and schedule of payments. Most mortgage notes are freely transferable from the original lender to others. Lenders, in fact, sell most loans to third parties, either directly or through the **securitization** process in which groups of mortgages are pooled together and sold as a security to investors. The Enterprises are the most prominent participants in the purchases and sale of mortgages; they accounted for approximately 70% of the nation's issuances of MBS in 2010. Rather than lend directly to homeowners, they purchase mortgages from the original lenders and other buyers. The mortgage note specifies that the borrower must repay the noteholder, which may differ from the original lender if the loan is sold.

**Figure 9. Mortgage**




## The Security Instrument

The security instrument is the separate legal document or agreement that pledges the house as collateral for repayment of the note. The security instrument goes by various names, such as the "mortgage," the "deed of trust" (DOT), or the "trust deed," depending on its form and the state in which the house is located. In many states, it is typically recorded in the county recorder of deeds offices in order to establish the mortgagee's interest in the property as a matter of public record. This is important because it establishes the mortgagee's rights in the property relative to other parties, including other mortgagees. The majority of mortgages are recorded using a private recordation company known as the Mortgage Electronic Registration System (MERS). When MERS is used, it is listed in county property records as the mortgagee, while the real mortgagee is tracked in MERS' private registry. The validity of MERS' various

processes has been the subject of significant and on-going legal controversy.

**Lien:**
The lender's right to have a specific piece of the debtor's property sold if the debt is not repaid. With respect to residential mortgages, the noteholder retains a lien on the house (as evidenced by the mortgage or deed of trust) until the loan is repaid.

The form of the security instrument affects the foreclosure process. Legally speaking, a mortgage is the granting of a **lien**. The homeowner, as mortgagor, retains title to the property and grants a contingent interest to the lender as mortgagee. Alternatively, a DOT is more akin to a sale and repurchase: the homeowner, as trustor, gives title to the property to the DOT trustee, who holds it on behalf of the lender as beneficiary. The DOT trustee is typically a title company or a local attorney. The DOT trustee is charged with releasing the deed to the trustor if the loan is paid off or with foreclosing if the trustor defaults. In the standard DOT arrangement, if the homeowner defaults, the beneficiary noteholder will appoint a substitute trustee, often an affiliate, to handle foreclosure. The precise duties of DOT trustees may be a potential issue in foreclosures.[h]

**Figure 10. Deed of Trust**




[h] DOT trustees should not be confused with securitization trustees. Many securitizations involve a trust that holds legal title to the mortgages and notes. These trusts have a trustee – a major financial institution – that acts as an agent for the trust, carrying out functions such as remitting payments to investors in the securities issued by the trust and reporting to investors on the performance of the trust's mortgages. The actual management of the mortgages, though, is carried out by another entity, known as the servicer.

*For more information on the servicer, see pages 26-27 of this report, Selected FHFA Programs and Activities.*

### The Servicer

All mortgage loans are "serviced," meaning the payments are collected and the loan otherwise is administered, including the release of liens upon payoff or the management of defaults. The servicer may be an arm of the original lender, or it may be an unrelated third party, in which case it is acting on behalf of the current owner of the loan, typically under a detailed contract known as a "pooling and servicing agreement" or "loan servicing agreement." As the majority of mortgage loans are sold by their original lender (sometimes referred to as the loan's "originator"), most loans have servicers that are unaffiliated with the original lender. For example, the Enterprises do not service any of the loans they own themselves; instead, they use third-party servicers, typically affiliates of the parties that sold the loans to them.

Subcontracting arrangements are common in servicing, so a borrower's contact may in fact be with a subservicer, a vendor, or an attorney engaged by one of these parties. Both servicing and subservicing contracts frequently impose limitations on the servicer's ability to manage the loan, including when and how the servicer may modify or otherwise restructure a loan.

## DEFAULT

Default is the prelude to foreclosure. Although various technical defaults are possible, the typical default is a failure to make payments as required on the mortgage. Most mortgages require defined payments each month (though the amount due may vary if the mortgage has an adjustable rate), and mortgage servicers will often refuse to accept partial payments. Figure 11 illustrates the remediation process for a defaulted loan. The outcomes following a default depend on factors such as the amount and degree of delinquency, the borrower's overall financial situation, the value of the property and amount of indebtedness, the servicer's economic interests (as distinct from the mortgagee's), and constraints placed on the servicer by contract and applicable laws. Thus, a defaulted residential mortgage may return to good standing, or be modified, or the property may be sold or repossessed by the mortgagee via foreclosure or a voluntary surrender.

Generally, servicers will not commence a foreclosure until a mortgage is 90 days delinquent – that is, until the borrower has missed three consecutive payments. Thus, a homeowner can conceivably fall behind on a mortgage for a month or two and catch up without the servicer commencing a foreclosure. However, it is important to note that a servicer

may legally begin foreclosure proceedings before a mortgage is 90 days late. Ninety days is a common practice, not a legal requirement.

**Figure 11. Foreclosure Process Flowchart**



## Loss Mitigation

In some cases, the default may be cured and the loan reinstated. In addition, depending on individual circumstances, alternatives may exist that permit defaulted borrowers to remain in their homes while addressing their payment delinquency. It is important to note that most of these options are voluntary, but state law and contractual arrangements, including the acceptance of MHA program funds from Treasury, may trigger particular loss mitigation duties on the part of the servicer.

**Mediation:**
Mediation is a process by which a neutral third party (mediator) assists the homeowner and lender in reaching a fair, voluntary, negotiated agreement. The mediator does not decide who is right or wrong.

***Mediation.*** Many states offer or require pre-foreclosure mediation between homeowners and servicers. In some states servicers are required to mediate in good faith in order to proceed with foreclosure. This may include presenting the homeowner with all appropriate paperwork for a foreclosure and having authority to accept settlement offers.

***Modification.*** Common modifications include extending the mortgage's maturity date, adding past-due payments to the end of the mortgage, and making both permanent and temporary interest rate reductions. In most cases, when appropriately applied, these measures will lower the borrower's re-amortized monthly mortgage payment to a more affordable level.

*Figure 12, at the end of this overview, lists those states that offer or require mediation as part of the mortgage loan default remediation process.*

Reductions in the borrower's unpaid principal balance are uncommon. Although HAMP permits principal reductions at participants' option, the Enterprises do not provide for principal reductions in their implementation of HAMP. Homeowners should be aware that under certain circumstances the forgiven debt may be deemed income for tax purposes.[1]

*A detailed listing of borrower eligibility criteria for HAMP and other MHA assistance programs is available at www.makinghomeaffordable.gov.*

*The websites of Fannie Mae (www.fanniemae.com) and Freddie Mac (www.freddiemac.com) incorporate utilities that permit borrowers to learn whether those organizations guarantee or own specific home loans.*

***Forbearance.*** Lenders may always exercise forbearance on defaulted loans, meaning that the lender may simply decline to proceed with foreclosure. Homeowners have no right to forbearance, unless they are active duty military servicemembers covered by the Servicemembers Civil Relief Act or have been so within the previous 90 days. Note that some types of modifications, such as ones that tack past-due balances onto the end of loans as balloon payments, are sometimes referred to as forbearance.

By contrast to payment reductions, payment forbearance involves temporarily suspending the need to make mortgage payments. In their guidance to loan servicers, Fannie Mae and Freddie Mac permit payment forbearance for up to six months in the cases of unemployed borrowers. Servicers must consider unemployed borrowers for such forbearance

before consideration for a HAMP loan modification. Borrowers who are not offered any such forbearance must be evaluated for HAMP.

**Common Misperceptions About Enterprise Policies for HAMP Participants**

Published reports indicate that mistaken or outdated understandings may persist among participants (both servicers and borrowers) in HAMP for loans owned or guaranteed by the Enterprises. Three common misperceptions are discussed below:

- **HAMP Participants Must Be Delinquent**. HAMP does not require homeowners to be actually delinquent in their payments before participating. Despite reported cases of mortgage servicers indicating that homeowners must be delinquent, and in some cases actually encouraging them to fall behind in their payments, program guidance and the Enterprises' servicer directives explicitly permit participation by homeowners who remain current, but for whom default is "reasonably foreseeable."
- **HAMP Requires a Very Long Trial Period**. The Enterprises' published guidance states that the initial trial period for HAMP participants "must be three months long for mortgage loans already in default and four months long for mortgage loans where the servicer has determined that default is imminent but has not yet occurred," contrary to reported instances of borrowers making trial payments for much longer.
- **The Foreclosure Process Can Proceed While Loss Mitigation Efforts are Underway**. As a result of FHFA's Servicing Alignment Initiative, current Enterprise guidance states that servicers may not commence the foreclosure process as long as they are engaged in a good faith effort with the borrower to resolve the delinquency. "Dual tracking" a single loan for both foreclosure and modification is prohibited. Additionally, before a loan is referred for foreclosure, the servicer must also perform a formal review of the case to ensure that appropriate alternatives were considered.

***Refinancing.*** Another option for handling a defaulted loan is to replace it with a new loan via a refinancing. The terms of the new loan can be whatever the borrower and new lender negotiate; the proceeds of the new loan are used to pay off the balance on the old loan. When the old lender is paid off, the old lender releases its lien on the property.

The difference between refinancing and modification is that refinancing entails a new loan, whereas modification is simply a change to the terms of an existing loan. A refinancing can involve the substitution of a new lender for the existing lender or a new loan from the existing lender, whereas a modification involves the same lender. Because a refinancing involves a new loan, there are generally closing costs associated with a refinancing, whereas modification may or may not involve fees to the borrower.

Traditionally, refinancing requires the payment in full of the existing loan. Most mortgage loans have "due on sale" clauses that require payment of the full balance of the loan upon the sale of the property and further define a refinancing as a sale. Unless the existing mortgage is paid off, the existing mortgagee continues to hold a lien on the property that is senior to the new lender's. Payment in full via a refinancing thus requires the

homeowner to have **equity** in the property, as today lenders will almost never extend credit beyond the value of the property (above a 100% loan-to-value ratio). Accordingly, refinancing has not been an option, generally, for borrowers who are **underwater**, even if they are current on their mortgage. However, the Enterprises will refinance qualifying underwater mortgages they own or guarantee under the federal government's Home Affordable Refinancing Program (HARP). Loans that are held on banks' balance sheets or in private-label securitizations are not eligible for HARP.

**Equity:**
In the context of residential mortgage finance, equity is the difference between the fair market value of the borrower's home and the outstanding balance on the mortgage (and any other debt secured by it, such as home equity loans).

**Underwater:**
Term used to describe situations in which the homeowner's equity is below zero (i.e., the home is worth less than the balance of the loan(s) it secures).

*On October 24, 2011, FHFA announced revisions to HARP to expand the number of eligible homeowners. FHFA-OIG will discuss these revisions in greater detail in the next Semiannual Report.*

In addition, some lenders will accept a "short refinancing" in which they receive less than the full unpaid principal balance, may forgive the remaining balance, and release the lien. They may choose to do so if they believe that they will make more in a partial payment via a refinancing than they will in a foreclosure sale. FHA, for example, offers a short-refinancing program: for qualifying borrowers who do not currently have FHA-insured loans, FHA will insure a new first lien mortgage loan at up to 97.75% loan-to-value ratio based on a fresh appraisal. This means that the existing lender must agree to a write-down of the balance as part of the refinancing. FHA requires that the existing lender reduce the existing balance by at least 10% and that the combined loan-to-value ratio of all mortgages on the property be no more than 115%. While short refinancing may be a valuable solution for underwater borrowers, refinancing with a new lender is often very difficult for borrowers with impaired credit scores (which includes any borrower who has defaulted), or even for those with relatively good credit scores.

## FORECLOSURE AND ITS EFFECTS

If loss mitigation efforts do not succeed, the defaulted loan will proceed to foreclosure. There are two basic types of foreclosure. Judicial foreclosures proceed through the court system, while nonjudicial foreclosures take place outside it. The type of foreclosure process and other specific features are governed by state law, which varies considerably among the states, and by the terms of the mortgage itself. Some mortgages permit only one type of foreclosure. Some states permit only one type of foreclosure, while others provide for the possibility of either. State law can also vary depending on the type of property involved (its size and use) and by whether the mortgage was a purchase money mortgage or a refinancing of a previous mortgage. This overview is designed to present a general description of the foreclosure process. Actual state law may vary from the process described herein, and this overview should not be relied upon as a legal guide.

### Judicial Foreclosure

A judicial foreclosure is a litigation process with a specific remedy. Generally, the loan servicer, on the noteholder's behalf, commences the foreclosure by filing a suit against the homeowner. If those bringing the suit cannot prove that they are acting on behalf of the party entitled to repayment under the terms of the note, they may lack legal standing to do so. Similarly, a foreclosure may be invalid if the foreclosing party or its representative files suit before becoming the holder of the note and the mortgagee.

**Junior Lienholder:**
The security interest that can be availed only after the senior lien is satisfied, is called a junior lien. The holder of this security interest is the junior lienholder. Depending on the relative priority of the junior lien, the junior lienholder may be the second mortgagee, third mortgagee, etc. For example, a bank holding a home equity mortgage on a home is the junior lienholder to the bank holding the primary mortgage.

To begin a foreclosure action, the noteholder's representative files various documents with the court in the form of a "complaint." It also must serve the complaint to the homeowner, notifying him or her of the litigation. Additionally, notice must typically be sent to all **junior lienholders**, such as home equity lenders. The specific requirements vary by state, but state law typically requires the foreclosing party to assert for the record that:

- the homeowner is indebted to the foreclosing party;
- the homeowner has defaulted on the loan;
- the loan is secured by a mortgage, and the foreclosing party is or represents the mortgagee; and
- service of process has been made on the homeowner.

These are typically made via affidavits – sworn written statements submitted to the court. For example, the fact and amount of the indebtedness are typically established via an affidavit of indebtedness. State law requires that affidavits be sworn out by affiants who have personal knowledge of the facts to which they attest. Such affidavits are typically notarized.

**Robo-signing.** In mid-2010, certain leading mortgage servicers were found to be routinely submitting flawed affidavits to courts in foreclosure cases. Affidavits are supposed to be sworn out by affiants with personal knowledge of the facts, which are attested to in the affidavit, such as the fact and amount of the homeowner's indebtedness and that the homeowner had defaulted on the loan. In the course of depositions in foreclosure cases, servicers were found to have employees whose sole job was to sign foreclosure affidavits, as many as 10,000 affidavits in a single month by some employees (roughly one per minute). These employees had no personal knowledge of any of the facts to which they attested.

As robo-signing began to garner media attention, several major servicers imposed voluntary moratoria on their foreclosure activities. All have subsequently resumed foreclosures, although some foreclosure filings have been withdrawn and resubmitted and, in Maryland, a state judge threw out over 10,000 foreclosures filed by Ally Financial Inc. (formerly known as GMAC, LLC) because of robo-signing. Federal banking regulators commenced an investigation of robo-signing practices that resulted in consent orders between leading servicers and the federal regulators, in which the servicers agreed to improved internal controls. State attorneys general are still investigating robo-signing and related issues.

While media attention was focused on the lack of personal knowledge of the affiants and the sheer volume of signatures made by individual robo-signers, more serious issues lurk in the robo-signing scandal. In particular, the backdating of mortgage transfer documents was the focus of the depositions in which robo-signing was uncovered. The date of the transfer of a mortgage is critical for three reasons:

- First, it may affect whether a servicer has legal standing to foreclose; only the mortgagee has such standing. In *Ibanez v. U.S. Bank*, the Massachusetts Supreme Judicial Court upheld the reversal of a foreclosure in which the servicer could not prove that the loan had been transferred to the securitization trust before the foreclosure was commenced.
- Second, it may affect whether the servicer is a "holder-in-due-course," a special legal status that prevents the homeowner from raising certain defenses (including that the homeowner was fraudulently induced into the mortgage) and counterclaims. A party that receives a loan that is in default cannot be a holder-in-due-course, so determining the date of transfer is critical to ensure that the homeowner is not wrongfully deprived of his or her legal rights to raise defenses and counterclaims.
- Third, for securitized loans, tax and trust law rules depend on the date of the transfer. If the loan was transferred too late, there may be adverse tax consequences for the investors in the mortgage-backed securities and the transfer may itself be void under trust law.

Thus, issues related to the timing of transfers of mortgages (often referred to as "chain of title") have profound legal implications.

Generally, state law requires that a copy of the mortgage note accompany the complaint. The foreclosing party may be required to produce the original "wet ink" or "blue ink" note. Often state law requires the filing of the mortgage itself as part of the complaint, but because recorded mortgages (unlike notes) are public records, a reference to the mortgage may be sufficient. Some states also require certification of mandatory loss mitigation efforts, such as mediation, prior to foreclosure.

Most judicial foreclosures are not contested and result in default judgments against the homeowner. In such cases, it is rare for courts to undertake more than a cursory examination of the sufficiency of the foreclosing party's filings.

If a homeowner contests a foreclosure, either because of procedural deficiencies or on the basis of substantive defenses and counterclaims, then the case is litigated like a regular civil action. A homeowner's ability to raise defenses and counterclaims depends on whether the foreclosing party is a "holder-in-due-course" of the defaulted note. To be a holder-in-due-course, the foreclosing party must: (1) possess the actual note; (2) have given value for the note and taken it in good faith; and (3) have no notice of any defect in the note, including that the note is in default. This means that if the note were transferred to the foreclosing party subsequent to the default, the foreclosing party is not a holder-in-due-course, so the homeowner may raise a full battery of defenses and counterclaims in the foreclosure action.

**Show Me The Note.** Foreclosure defense litigation has begun to feature variations of the "show-me-the-note" defense, in which the homeowner challenges the foreclosing party to prove that it has the right to foreclose. In its most basic form, this defense is a demand that the foreclosing party produce the original mortgage note, but the term refers to a range of challenges relating to the foreclosing party's standing.

Critically, the show-me-the-note defense does not involve a claim that the homeowner is not in default. Instead, it focuses on whether the foreclosing party is the party that is legally entitled to foreclose and has made the required evidentiary showings. Determining the proper party is important for issues of legal standing, holder-in-due-course status, and the homeowner's ability to raise various defenses and counterclaims, and because it affects settlement abilities and incentives. A portfolio lender, for example, may have very different settlement abilities and incentives than a third-party mortgage servicer.

*Kemp v. Countrywide Home Loans, Inc.*, 449 Bankr. 624 (Bankr. D.N.J. 2010) provides an illustration of a successful "show-me-the-note" defense. In *Kemp*, the homeowner had taken out a loan from Countrywide Home Loans, Inc. Countrywide subsequently securitized the loan, selling it to a trust named CWABS Asset-Backed Certificates, Series 2006-8. The Bank of New York served as trustee for the trust and Countrywide as servicer for the trust.

The homeowner filed for bankruptcy, having previously defaulted on his mortgage. Countrywide, as servicer, filed a claim in the bankruptcy on behalf of the trust. The homeowner challenged that claim based on the fact that the mortgage note had not been properly endorsed to the Bank of New York as trustee for the securitization trust and was never placed in the Bank of New York's possession. Accordingly, the homeowner argued, the trust was not a party entitled to enforce the note, as only a physical holder of the note, a non-holder in possession, or someone who has lost a note may enforce a note.

During the trial, Countrywide produced an "allonge" — a separate sheet of paper to be affixed to a note to allow room for additional endorsements. This allonge contained the endorsement that was missing on the note itself (albeit with an error in the name of the trust). Countrywide's official witness, however, testified that the allonge had been created in anticipation of the litigation. The official witness further testified that the original note had never left Countrywide's possession and that the new allonge had never actually been affixed to the note — it was simply a piece of paper with an endorsement, but no indication of what had been endorsed.

The bankruptcy court denied the claim Countrywide had filed on behalf of the trust because the trust could not show that it was a party entitled to enforce the note. The trust was neither a holder of the note (an owner of the note in physical possession of the note), nor a non-holder (someone who lacks ownership of the note) in possession of the note, nor had it lost the note. Because the Bank of New York, as trustee, and Countrywide, as its agent, were not entitled to enforce the note, the bankruptcy claim against Kemp was disallowed.

If the court awards judgment to the foreclosing party, the property is then scheduled for sale, typically by the county sheriff. Sale scheduling is determined in part by requirements for advertisement of the sale for a minimum time period. The homeowner may, of course, appeal the foreclosure judgment.

### Nonjudicial Foreclosure

Nonjudicial foreclosures proceed rather differently. There are no court filings or showings of proof required. Instead, in a nonjudicial foreclosure, the foreclosing party must notify the homeowner of the default and the scheduled sale. Sometimes this requires a formal "notice of intent to foreclose." It is also required to advertise the sale. Advertisement requirements vary significantly by jurisdiction, but generally the sale must be advertised in a newspaper of record for the community for a few weeks prior to the sale. The assumption in a nonjudicial foreclosure proceeding is that the foreclosing party has the right to foreclose, provided that it appropriately provides notice and advertises the sale.

A nonjudicial foreclosure may effectively be transformed into a judicial foreclosure if the homeowner brings a quiet title action or the equivalent, which has the effect of contesting the foreclosure sale's transfer of title to the foreclosure sale purchaser. Conversely, foreclosure sale purchasers will sometimes bring subsequent judicial actions to ensure quiet title, particularly if there are any questions about the procedural propriety of the sale.

### The Foreclosure Sale

The rules governing the actual foreclosure sale vary by jurisdiction. Sales are conducted by auction, but there are usually few if any rules governing the actual sale in nonjudicial foreclosures. The timing and the bidding in judicial foreclosure sales is frequently specified in detail by statute, including minimum bids, appraisal requirements, deposits, and completion of payment. Some jurisdictions, however, leave details of the bidding up to the local government official, typically the sheriff, who conducts the auctions.

Two constant rules for all foreclosure sales are the order of payment and the effect on liens. The proceeds of a foreclosure sale are used first to cover the expenses of the sale. They are then paid to the foreclosing party, and, if there are surplus funds, to junior lienholders in their order of seniority. Rules of lien priority generally follow a first-in-time, first-in-right pattern, with the first lienholder to **perfect** its lien (by making the

**Perfection:**
The legal recording of evidence for a creditor's lien on a particular item of property.

necessary legal filings or automatically in some cases) having seniority over subsequently perfected (or unperfected) liens. There are many exceptions to this pattern, however. Notably, state tax liens frequently have priority over other previously perfected liens. If any surplus remains, it is paid to the (former) homeowner.

There is no right for prospective buyers (or the foreclosing party) to inspect the property before the foreclosure sale. Prior to the completion of the sale, the property still belongs to the mortgagor/homeowner. Accordingly, third parties tend to discount foreclosure sale purchase bids heavily. Although they can ascertain the external condition of the property, they cannot discern the layout or condition of the property internally, and many foreclosed properties have been damaged prior to sale.

The inability to inspect the property pre-sale, as well as the foreclosing party's ability to "credit bid," means that there are relatively few bidders in most foreclosure sales other than the foreclosing party. Most foreclosure sale properties are purchased by the foreclosing party via a "credit bid." This means that the foreclosing party bids the amount it is owed on the loan rather than bidding with cash. In other words, a credit bidding party merely credits itself rather than writing itself a check. A credit bidding party typically bids in the full amount of the debt owed, which means that a third-party bidder must be willing to pay a higher cash price to win the auction. By credit bidding, the foreclosing party can obtain clear title to the property, inspect the property, fix it as necessary, and then resell it subsequently.

It is important to note that foreclosure sales are frequently cancelled or rescheduled. This may occur for a variety of reasons, including ongoing negotiations between the borrower and the lender; intervening bankruptcy filings; and inability to complete procedural steps, including accumulation of necessary documentation.

### Cures

Until the completion of the foreclosure sale, the homeowner may cure the default and stop the foreclosure. Typically this requires payment of the entire mortgage debt, as the lender will have **accelerated** the debt. The lender may be willing, but is under no obligation, to stop the sale if only past due payments are tendered.

**Acceleration:**
The declaring of a debt due and payable immediately. Lenders may possess this right under certain conditions, according to the terms of the obligation or applicable law.

If the homeowner files for bankruptcy, the foreclosure sale is automatically stayed, and federal bankruptcy law permits homeowners to

unwind the acceleration of a mortgage and cure by paying only the past due payments and associated costs.

### Deficiency Judgments

The foreclosure sale may not provide proceeds sufficient to satisfy the mortgage debt. In such cases, the noteholder's representative (and any junior lienholders) may seek a deficiency judgment – a legal judgment for the remaining amount of the debt. A deficiency judgment is an unsecured debt, like credit card debt, and collection follows the procedure for other unsecured debt. This means that deficiency judgments are often difficult for lenders to collect, as many states place restrictions on wage garnishment and unsecured debts are generally dischargeable in bankruptcy. Accordingly, noteholders often sell deficiency judgments to third-party debt collectors at substantial discounts from face value. Attempts to collect these debts are typically subject to the provisions of the Fair Debt Collection Practices Act as well as to state debt collection law.

The availability and procedure for a deficiency judgment varies by state and foreclosure process. Generally, deficiency judgments are not available when nonjudicial foreclosure is used because of concerns that private sales might be manipulated to suppress foreclosure sales prices in order to produce a larger deficiency judgment. In some states, deficiency judgments are available automatically following a judicial foreclosure. In others, the foreclosing party must file a motion or a complaint for a deficiency judgment. Even then, there is variation as to whether a deficiency judgment (if allowed) is awarded as a matter of right or by judicial discretion.

### Right of Redemption

*Figure 12, at the end of this overview, summarizes provisions for right of redemption by state.*

In some states, homeowners have a statutory post-foreclosure sale "right of redemption." This means that the homeowner can redeem – reclaim title to – the house by tendering the amount of the unpaid debt and foreclosure sale costs. The length of the statutory redemption period varies considerably, from as short as 10 days in New Jersey to 2 years in Tennessee. The existence of rights of redemption is a factor foreclosure sale purchasers are likely to consider, as they run the risk of being deprived of their foreclosure sale purchase (even though the purchase price is returned). While it is uncommon for foreclosed homeowners to come up with the cash to redeem their properties during the redemption period, the right is exercised at times.

### Eviction

If the former homeowner does not voluntarily surrender the property following the foreclosure sale, the foreclosure sale purchaser can have the former homeowner evicted. Eviction is also a state law procedure; the precise process varies by state law, but it is not always automatic. Because foreclosure sale purchasers are often concerned about former homeowners damaging the property before they leave, they are often willing to negotiate with homeowners regarding relocation timetables and costs. They are, however, under no obligation to do so.

### Renters Living in Foreclosed Property

Sometimes a foreclosed property is occupied by renters. Renters' rights in a foreclosure involving their landlord vary by state. Since 2009, however, the Helping Families Save Their Homes Act has included minimum protections for renters in the foreclosure of most mortgages, including all mortgages owned by the Enterprises. If the renter has a *bona fide* lease entered into prior to the notice of foreclosure, then the renter may occupy the property until the end of the remaining term on the lease unless the renter is given notice of termination by the foreclosure sale purchaser, in which case the renter has 90 days of occupancy rights. If the renter is not renting under a lease or the lease is terminable at will, then the renter also has 90 days of occupancy rights from notice of termination. Some states give renters additional occupancy rights; others merely give renters the right to notice of the foreclosure.

### Liability for Insurance, Taxes, and Homeowners' Fees

Until title passes to the foreclosure sale purchaser, the homeowner typically remains liable for taxes, homeowners' association dues, nuisances, and accidents on the property. Noteholders or their representatives typically have the right to force-place insurance on the property if the homeowner has failed to maintain insurance payments. Force-placement of insurance involves the noteholder's purchasing insurance on the property with itself as the loss-payee. Force-placed insurance can be expensive relative to regular insurance, and some servicers force-place insurance with their affiliates.

Post-sale, the liability falls on the property's new owner. In some communities, however, a phenomenon known as "bank walkaway" has occurred in which a servicer will commence a foreclosure, but not complete it. Frequently, bank walkaway occurs when the property's value is so low that it is not worth the expense of foreclosure. In bank walkaway cases, the homeowner remains the owner of the property, although in

many cases he or she will have moved out because of the anticipated foreclosure. Because the homeowner remains the title owner of the property, he or she remains liable for property taxes and upkeep. Thus, the homeowner could be subject to fines and other penalties if the property becomes a nuisance, or the homeowner could be liable for accidents that occur. Similarly, the noteholder's representative may complete the foreclosure and purchase the property itself in the foreclosure sale, but fail to record the deed in its own name. In such cases, the homeowner remains liable for property taxes.

### Impact on Credit Score

Mortgage defaults, foreclosures, deeds in lieu of foreclosure, and short sales can have adverse impacts on consumers' credit scores. A default, foreclosure, deed in lieu, or short sale may remain on a consumer's credit report for up to seven years. A bankruptcy may remain on a consumer's credit report for up to 10 years. The presence of adverse events on credit reports is likely to lower a consumer's credit score, which can make it more difficult or expensive for a consumer to obtain credit in the future. Credit reports are also used by insurers and employers, so adverse credit events can affect the cost of insurance and/or employment opportunities.

## FORECLOSURE ALTERNATIVES

*More information on HAFA is available at www.makinghomeaffordable.gov/programs/exit-gracefully/Pages/hafa.aspx.*

Depending on individual circumstances, alternatives may exist to foreclosure proceedings that reduce expenses or legal liability for troubled homeowners. However, like foreclosure, these options will typically result in the homeowner's loss of his or her house. These alternatives may include short sales, deeds in lieu, and bankruptcy. The Enterprises participate in the federal government's HAFA program, which is designed to encourage alternatives to the foreclosure process for troubled home mortgage loans. Participating HAFA servicers may not seek deficiency judgments and may provide relocation incentives of up to $3,000 for eligible homeowners who tender deeds in lieu of foreclosure or do short sales.

### Short Sale

Lenders may agree to a "short sale," in which the homeowner conducts a private sale of the house, and the lender releases its lien in exchange for the sale proceeds, even though the sale proceeds are insufficient to pay off the debt. A short sale does not necessarily discharge the homeowner's debt; it merely results in a release of the lien, so the homeowner may still be liable for the deficiency. If the lender forgives the deficiency, it may be

imputed as taxable income for the homeowner, particularly if the mortgage had a cash-out component.

There are certain barriers to a short sale. Servicers are frequently wary of short sale offers because of concerns that they are settling the debt at too low a price and that the bidder may have colluded with the homeowner. In addition, the high rate of denials for short sale offers has made realtors reluctant to handle them because realtors are only paid upon consummation of a sale and put in more effort in short sales than for regular sales.

### Deed in Lieu of Foreclosure

Lenders will sometimes accept a deed in lieu of foreclosure. This means that the homeowner will surrender title and possession of the property voluntarily, rather than requiring the lender to go through the full foreclosure process. For the lender, a deed in lieu spares the time and expense of the foreclosure process. For the homeowner, a deed in lieu may be attractive because the terms under which the homeowner surrenders the property may be negotiated – the lender may be willing to provide the homeowner with some relocation funds or a more generous timetable for moving out.

Critically, a deed in lieu does not extinguish junior liens, so the lender will acquire the property with junior liens still attached. Thus, if neither the homeowner nor the lender who has taken the deed in lieu pays off the junior lienholder(s), the latter may foreclose on the property. Accordingly, lenders may be reluctant to accept deeds in lieu when there is a junior lien on a property.

### Bankruptcy

A homeowner may file for bankruptcy at any point before, during, or after the foreclosure process. Bankruptcy is a federal judicial proceeding. A bankruptcy filing automatically stops the foreclosure process. If a lender wishes to proceed with a foreclosure against a bankrupt homeowner, the lender must get permission from the bankruptcy court to do so.

If the homeowner files for Chapter 7 bankruptcy and has defaulted, the homeowner will not be able to retain the property after the bankruptcy absent the lender's consent. If the homeowner files for Chapter 13 bankruptcy and has defaulted, the homeowner may de-accelerate the note and cure the default simply by making up missed payments rather than the full amount of the note. The homeowner may not, absent the lender's consent, modify the terms of the mortgage in bankruptcy if the property is

a single-family residence. For multi-family residences, the homeowner may be able to restructure the mortgage in bankruptcy.

**Figure 12. Summary of Foreclosure Process by State**

*For further information on homeowner assistance programs, borrowers should visit www.makinghomeaffordable.gov or call 888-995-HOPE.*

| State | Foreclosure Process[2] | Right of Redemption[3] | Mediation Programs |
|---|---|---|---|
| Alabama | Primarily nonjudicial | 1 year | None |
| Alaska | Primarily nonjudicial | No | None |
| Arizona | Primarily nonjudicial | No | None |
| Arkansas | Primarily nonjudicial | No | None |
| California | Primarily nonjudicial | 2 years if court grants deficiency judgment | Yes[4] |
| Colorado | Primarily nonjudicial | Redemption by lienholders allowed only within specified periods | Yes[5] |
| Connecticut | Primarily judicial | Yes, after judgment and before sale | Yes[6] |
| Delaware | Primarily judicial | No | Yes[7] |
| District of Columbia | Primarily nonjudicial | In optional judicial procedure there is a provision for redemption before judgment | Yes[8] |
| Florida | Primarily judicial | Yes, up to date clerk files certificate of sale | Yes[9] |
| Georgia | Primarily nonjudicial | No | None |
| Hawaii | Primarily nonjudicial | No | Yes[10] |
| Idaho | Primarily nonjudicial | No | None |
| Illinois | Primarily judicial | Yes, later of 7 months after service of complaint or 3 months after judgment | Yes[11] |
| Indiana | Primarily judicial | No | Yes[12] |
| Iowa | Primarily judicial | 1 year | None |
| Kansas | Primarily judicial | 3 to 12 months depending on percentage of debt that has been paid | None |
| Kentucky | Primarily judicial | 1 year | Yes[13] |

| State | Foreclosure Process[2] | Right of Redemption[3] | Mediation Programs |
|---|---|---|---|
| Louisiana | Primarily judicial | No | None |
| Maine | Primarily judicial | Mortgages after 10/1/75, 90 days. Mortgages prior to 10/1/75, 1 year | Yes[14] |
| Maryland | Primarily nonjudicial | No | Yes[15] |
| Massachusetts | Primarily nonjudicial | No | Yes[16] |
| Michigan | Primarily nonjudicial | 1 month to 1 year depending on size of parcel, number of units, percentage of original loan outstanding, and whether property is abandoned | Yes[17] |
| Minnesota | Primarily nonjudicial | 6 or 12 months depending on date of mortgage, size of property, and whether use is agricultural | Yes[18] |
| Mississippi | Primarily nonjudicial | No | None |
| Missouri | Primarily nonjudicial | 1 year | None |
| Montana | Primarily nonjudicial | Generally 1 year; for small tracts no | None |
| Nebraska | Primarily nonjudicial | No | None |
| Nevada | Primarily nonjudicial | No | Yes[19] |
| New Hampshire | Primarily nonjudicial | No | Yes[20] |
| New Jersey | Primarily judicial | 6 months | Yes[21] |
| New Mexico | Primarily nonjudicial | 9 months | Yes[22] |
| New York | Primarily judicial | No | Yes[23] |
| North Carolina | Primarily nonjudicial | 10 days | None |
| North Dakota | Primarily judicial | 60 days or 1 year for agricultural land | None |
| Ohio | Primarily judicial | Before confirmation of sale with the amount of judgment and associated costs paid | Yes[24] |
| Oklahoma | Primarily nonjudicial | Up to confirmation of sale | None |

| State | Foreclosure Process[2] | Right of Redemption[3] | Mediation Programs |
|---|---|---|---|
| Oregon | Primarily nonjudicial | No | Yes[25] |
| Pennsylvania | Primarily judicial | No | Yes[26] |
| Puerto Rico | Primarily judicial | No | None |
| Rhode Island | Primarily nonjudicial | No, except if foreclosure by process of law or by open entry then 3 years | Yes[27] |
| South Carolina | Primarily judicial | No redemption after sale. Redemption possible for 5 days after sheriff takes possession | None |
| South Dakota | Primarily nonjudicial | 1 year | None |
| Tennessee | Primarily nonjudicial | Generally no, could be 2 years but right to redemption is routinely waived | None |
| Texas | Primarily nonjudicial | No | None |
| Utah | Primarily nonjudicial | 6 months for judicial foreclosure | None |
| Vermont | Primarily judicial | In judicial strict foreclosure with no sale, 6 months. In judicial foreclosure with sale may redeem until sale | Yes[28] |
| Virginia | Primarily nonjudicial | No | None |
| Washington | Primarily nonjudicial | 8 months | Yes[29] |
| West Virginia | Primarily nonjudicial | No | None |
| Wisconsin | Primarily judicial | Up to time of sale; 12 months after judgment unless creditor waives right, if waived 6 months | Yes[30] |
| Wyoming | Primarily nonjudicial | 3 months | None |

## ENDNOTES

[1] *Commissioner v. Wilcox*, 327 U.S. 404 (1946).

[2] National Consumer Law Center, *Foreclosure Report: Survey of State Foreclosure Laws* (online at www.nclc.org/images/pdf/foreclosure_mortgage/state_laws/survey-foreclosure-card.pdf) (accessed Sept. 22, 2011).

[3] *Id.*

[4] National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[5] Douglas County Housing Partnership, *Foreclosure Mediation Program* (online at www.douglascountyhousingpartnership.org/foreclosure.htm) (accessed Sept. 22, 2011).

[6] State of Connecticut Judicial Branch, *Foreclosure Mediation Program* (online at www.jud.ct.gov/foreclosure/) (accessed Sept. 22, 2011); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[7] Delaware State Housing Authority, *NEW Residential Mortgage Foreclosure Mediation Program* (online at www.deforeclosurehelp.org/mediation.html) (accessed Sept. 22, 2011); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[8] District of Columbia, *Foreclosure Mediation Program (FMP)* (online at www.disb.dc.gov/disr/cwp/view,a,1299,q,645508.asp) (accessed Sept. 22, 2011).

[9] Collins Center for Public Policy, *Mortgage Mediation* (online at www.collinscenter.org/page/mediation_home) (accessed Oct. 27, 2011); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[10] Governor of the State of Hawaii, *Help for At-Risk Homeowners* (online at www.hawaii.gov/gov/newsroom/in-the-news/help-for-at-risk-homeowners) (accessed Sept. 22, 2011); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[11] Circuit Court of Cook County, *Mortgage Foreclosure Mediation Program* (online at www.cookcountyforeclosurehelp.org/) (accessed Sept. 22, 2011); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[12] Indiana Courts, *Help With Mortgage Foreclosures* (online at www.in.gov/judiciary/home/#how) (accessed Sept. 12, 2011); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 12, 2011).

[13] City of Louisville, Kentucky, *Mayor Abramson and Congressman John Yarmuth Announce Foreclosure Conciliation Project* (June 30, 2009) (online at www.louisvilleky.gov/Housing/News/2009); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[14] State of Maine Courts Judicial Branch, *Foreclosure Diversion Program* (online at www.courts.state.me.us/court_info/fdp/index.html) (accessed Sept. 22, 2011); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[15] Maryland Home Owners Preserving Equity, *Maryland's Foreclosure Mediation* (online at www.mdhope.dhcd.maryland.gov/ForeclosureMediation/Pages/default.aspx) (accessed Sept. 22, 2011); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[16] National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[17] Community Economic Development Association of Michigan, *Michigan Foreclosure Task Force* (online at www.cedam.info/resources/mftf/index.php) (accessed Sept. 22, 2011); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[18] Minnesota Housing Finance Agency, *Foreclosure Prevention* (online at www.mnhousing.gov/consumers/home-owners/foreclosure) (accessed Sept. 28, 2011).

[19] The Nevada Judiciary, *Foreclosure Mediation* (online at www.nevadajudiciary.us/index.php/foreclosuremediation) (accessed Sept. 12, 2011); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[20] New Hampshire Judicial Branch, *Office of Mediation and Arbitration - Summary of the Foreclosure Mediation Program* (online at www.courts.state.nh.us/adrp/foreclosure/index.htm) (accessed Sept. 22, 2011); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[21] New Jersey Judiciary Foreclosure Mediation Program, Home Page (online at www.nj.gov/foreclosuremediation/) (accessed Sept. 22, 2011); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[22] State of New Mexico First Judicial District Court, *Forms* (online at www.firstdistrictcourt.com/Forms.htm) (accessed Sept. 22, 2011); National Consumer **Law Center, *Foreclosure Mediation Programs by State* (online at**

www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[23] National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[24] Save the Dream Ohio, *Help for Homeowners* (online at www.savethedream.ohio.gov/Homeowners.aspx) (accessed Sept. 13, 2011); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[25] National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[26] National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[27] National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[28] The University of Vermont, *Mortgage Issues and Foreclosure* (online at www.uvm.edu/consumer/?Page=foreclosure.html) (accessed Sept. 13, 2011); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 22, 2011).

[29] Washington State Department of Financial Institutions, *Washington Foreclosure Mediation Program* (online at www.dfi.wa.gov/consumers/homeownership/foreclosure-mediation.htm) (accessed Sept. 22, 2011).

[30] Marquette University Law School, *Milwaukee Foreclosure Mediation Program* (online at www.law.marquette.edu/foreclosure/) (accessed Sept. 22, 2011); National Consumer Law Center, *Foreclosure Mediation Programs by State* (online at www.nclc.org/issues/foreclosure-mediation-programs-by-state.html) (accessed Sept. 29, 2011).

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

In re: Garrett B. Tupper Jr., Respondent,

Vs

US Trustee

Case No. 24-73979
Chapter 13

-------------------------------------------------------------X

**CERTIFICATE OF SERVICE**

The undersigned certifies that on January 2, 2025 a copy of the annexed Motion To Reopen Case with Exhibits A, B, and C, and was served by depositing same, enclosed in a properly addressed postage paid envelope in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York, upon:

Dated: January 2, 2025.

/s/Garrett B. Tupper Jr.
Garrett B. Tupper Jr.

MTGLQ INVESTORS LP
200 WEST ST
New York NY 10282

S/N Servicing Corp.
323 5th Street,
Eureka, CA 95501

**MICHAEL T. ROZEA, ESQ**
FRIEDMAN VARTOLO LLP
Attorneys for Movant
1325 Franklin Avenue, Suite 160
Garden City, New York 11530: BY ECF

**MICHAEL J. MACCO**
Chapter 13 Trustee
Office of the United States Trustee
2950 Express Drive South, Suite 109

Islandia, New York 11749
Tel: (631) 549-7908
**BY ECF**